2017-60781 Avalon Place Trinity v. United States Department of Health and Human Services. You may proceed with your argument. Thank you, Your Honors. Good morning. May it please the Court. My name is Allison Spruill. I represent the petitioner in this case, Avalon Place Trinity. Almost 57 years ago, 1962, when Justice Byron White first became an Associate Justice on the U.S. Supreme Court, in his very first opinion, he authored what I believe for this particular case is a very telling quote. Agency discretion is the lifeblood of the administrative process. But unless we make the requirements for agency action strict and demanding, the strength of a modern government can become a monster that rules with no practical limits on its discretion. Against this backdrop, Avalon Place Trinity, as the Court is aware, is a nursing home that participates in the Medicare and Medicaid programs. Most nursing homes' financial viability depends upon government funding. Unfortunately, at least in the state of Texas, where Avalon Place Trinity is located, the Medicare and Medicaid reimbursement rates fluctuate between the 47th and 48th lowest in the country. It's one of the most heavily regulated, if not the most heavily regulated, industries in the country, and with good reason. Nursing home service, one of the most vulnerable, if not the most vulnerable, segments of our population. Because of the heavy regulation, nursing homes such as Avalon Place are subject to surveys. There are annual surveys for licensing regulation and compliance with Medicare conditions of participation. There are complaint surveys when somebody calls in a complaint to the state hotline. And there are what's called incident investigations, which are pursuant to an incident that perhaps the facility has reported, pursuant to state-mandated reporting requirements. Once these surveys are conducted, if the surveyors, who unfortunately sometimes don't even have any long-term care experience, and if the surveyors come in and determine that the regulations or the conditions of participation were not met, they cite deficiencies. Those deficiencies then can have monetary consequences. Per day fines, per instance fines. In this case, we were dealing with a per day fine that was, I think, right at $90,000. The way for calculating or the method of calculating these penalties was increased unilaterally by the agency a couple of years ago. If these penalties were to be imposed now, they would probably be upwards of $400,000 or $500,000. Ms. Sproul. Yes, Your Honor. Thank you for that sort of setting the background. Yes, Your Honor. Just so I can understand procedurally, we have surveyors who found deficiencies. Yes, sir. There was an ALJ who conducted a hearing, made findings. Then there was an appeal to the appeals board. Correct me if I'm getting the terminology wrong. Yes, sir, to the full departmental appeals board. To the full departmental appeals board. Upheld the findings, and now you're before us. Yes, sir, because in a case involving a CMS monetary fine, such as we have here, we're not allowed to go to the district court. Sure, understood. We go straight from the board to you. Understood. Now, we're looking at these findings, or more accurately, the assessment of the findings by the appeals board. I want to get the standard of review right first. Yes, Your Honor. See if you agree with me. Yes, sir. If there's substantial evidence supporting those findings by the ALJ, it's over, right? Is that right? I don't think it's that simple, Your Honor, and that's one of the reasons that we asked to come and visit with you today. Tell me, tell me. I recognize, certainly, I would be remiss in not admitting that in seeking to overturn an agency decision on a petition for review as a petitioner, I have a monumental task. I have a huge uphill task because of the deferential standard. But I don't think, Judge Duncan, that it's quite as simple as saying if there's substantial evidence, our inquiry ends, period, because there are other ways that the findings of the agency, which in this case are essentially the same as the findings of Judge Hughes, the ALJ, they can be overturned. They can be overturned if the agency or the ALJ was found to have abused its discretion or if the findings are arbitrary and capricious. And within those two parts of the deferential standard, which are distinct and separate from substantial evidence, there are requirements, and it's our position that we don't think the rulings were supported by substantial evidence, but you never have to get that far. Okay. Well, I had understood your argument to be focused on the substantial evidence, but I'm open to hearing what other. Well, we believe that there is a tie-in between the substantial evidence in this case based on these particular facts. Can we drill down, please? I want to ask you about you're concerned that your client did not know that the patient was a fall risk, right, because they didn't know from the therapy notes because they didn't have the therapy notes, whether they were created after the fact as fabrications or if there's some miscommunication of why they didn't have them. Sure, Judge. My client, on the day that this resident, resident number 73, was admitted, his fall risk was assessed, and he was assessed at a minimal risk. He obtained a score of 7, and in the record there's the page that has that scoring, and what that number means is a minimal fall risk. Probably, and I believe the evidence in the record from Jackie Stevens and Angel Bino was that most residents in the nursing home present some fall risk. The question is, was he such a fall risk that different interventions needed to be in play or different levels of supervision were required other than what the nursing home was providing him, and the therapy records contain drastically different assessments than what the people at the nursing home, our employees, saw. Didn't the transfer records indicate that he needed help with walking and toileting? Only in terms of getting him from the bed to the walker. The transfer is getting him set up. I believe there are- Wasn't that the thing that was happening in this situation? No, Your Honor. He had already made it in terms of the incident that occurred. He had already made it into the bathroom. He ambulated with what's called a rolling walker, and the nurse aide observed him was in the room when he physically got to the bathroom. She had gotten him up, gotten him dressed. He said he needed to use the restroom before they left for the doctor's appointment. She watched him go from the bed or the area beside the bed to the bathroom, and he was fine. She asked him if he needed any additional help. He replied no. He asked for privacy to use the restroom. And there are also nurse aide records in terms of toileting that states he was independent in toileting. Okay. The incident report, when was that completed that says he has a history of falls? The incident report was not until after, I think a day or two after the incident occurred. There was perhaps a discussion with hospital staff or additional family members. There was certainly nothing in the nursing home records to indicate there was a history of falls prior to this time. His wife didn't indicate that. So you think that the whole thing depends on these therapy notes? No, Your Honor. I don't. Okay. I think that the more pivotal piece of information is the statement from Dr. David Mandel, the treating physician who had seen him a week before this incident and who saw him at 6.30 in the evening on the night before the incident occurred the following morning. And one of the conditions that Dr. Mandel was treating him for, myelodysplastic syndrome, that is not something that even appears anywhere other than perhaps to mention it. We don't see that diagnosis anywhere in Judge Hughes' initial opinion. And that's where we think that she failed is in not looking at that diagnosis, not looking at what medication he was given on the evening or the afternoon, excuse me, of March the 27th, just before this incident occurred. The doctor had made a change to his treatment plan because of this particular diagnosis, and the medication he was given is a medication called Procrit. And we discussed that in the briefing. Just because he was stronger because he had had this medicine, how is that the be-all and end-all if the therapy notes say that he was having all kinds of trouble and balance and issues and things? Are you saying that if we consider the therapy notes, isn't there substantial evidence, even if you have contrary evidence?  And I think we can take guidance from the Social Security cases, such as the Myers v. Apfel and Newton v. Apfel decisions from this court. I understand that, that we often defer to physicians. What does the record here show about the physician's assessment of whether he's a fall risk or not, though? The physician said he was independent and he was able to ambulate independently, and he did not need to be attended while he was toileting. And that's in the record? Yes, Your Honor. It is Petitioner's Exhibit 14, and I believe that's contained on pages 702 and 703. It is the statement from Dr. Mandel. And I will point out that Judge Hughes was critical of us for not calling Dr. Mandel as a witness in the hearing. However, this case she required to be submitted on pre-filed testimony, meaning we're not allowed to call witnesses. You only present them for purposes of cross-examination, and CMS did not request to cross-examine Dr. Mandel on his statement. So, therefore, we would not have been allowed under her pre-hearing order to have ever called him as a witness. But did you put in his testimony? Yes, Your Honor. Who put all that in? It is in. It's in. And so, I mean, she didn't discuss it, but she had it. She had it. Absolutely she had it. And she said, made comments, as did the board when the case went to them, that Dr. Mandel was not in the best position to know the needs of his residents because he wasn't there on a daily basis, and our point was he was there the night before. At 630, he had seen him a week before, he saw him the night before, he had a conversation with him, he observed his ambulation status, he observed his mental status, and he reached the conclusion that he did not require assistance when he was in the bathroom. And the other issue that we have, Your Honor, is if a resident asks for privacy, it's a resident's right. They have the right to ask for privacy. They have the right to refuse help. When the nurse aide, Brandy Ratliff, offered help, and he said no, that was absolutely his right. Notwithstanding that he was a doctor. Now, they say that you can overrule their rights for safety reasons. If there was a valid safety reason. However, we have a statement of a physician saying he was perfectly safe. Brandy had watched him walk to the bathroom with the rolling walker, and he was there and he was fine. She said, do you need any help? He said, no, please shut the door. She said, I'll be right out here. And she was there, maybe I think the timeline is three or four minutes, somewhere around that time frame. And she comes back in, and he's on the floor, half in and half out of the bathroom. Does that not bring us to the therapist notes that recommended he have supervision while going to the bathroom? Except those notes didn't exist, or at least were not in our possession. Okay. Are you saying that they're fabricated? Absolutely. Is that your argument? I am saying that. Okay. Do you have any evidence that they were fabricated? The testimony of Jackie Stevens and Angel Bino, who spoke with the person in the therapy office, that confirmed they were not even created until after resident number 73 was dead. And that's the problem. I go back to the abuse of discretion standard of review, Judge Duncan. In response to your earlier question, one of the key prongs in the abuse of discretion standard of review that gets away from strict deference is, did the agency or the ALJ rely on factors that were never intended? Does it mean fabricated? I don't know if we should quibble over this, but you could say that they hadn't yet been typed up, so they didn't have them, and that's just as good for you if they hadn't yet been typed up. You don't have to show that there's some kind of conspiracy drama here, do you? You just have to show that you didn't have them, and your people weren't aware of this. Absolutely, and what we use to show that we didn't have them is the admission that they weren't even created. That they didn't exist at the time. Maybe they were going to be somebody's recording that had to be transcribed or whatever. It could be a benign thing, right? It could be, but the point being there was no communication, because what's in our records is one communication by the therapist on the 27th, the afternoon of the 27th, saying he seemed tired during therapy, to which the nurse responded, we've got a new medication. We're aware of that. He's going to the doctor tomorrow. Here is the diagnosis. Here is the medication he's being given this afternoon, and why we're on top of this. They give him the medication. He reacts positively to it. The doctor sees him at 630 in the evening and documents in his note what his findings are. Was the ALJ making credibility determinations about who to believe on these issues? Did the notes exist? Did you know about the notes? I think she did make a credibility determination. But could she make a credibility determination if she didn't hear from the people, the therapist? It's our position that she shouldn't have. They didn't testify by written questions even, did they? They did not testify. They're not in the record at all. They are not in the record. So we just have the notes with the date on them, and then we have the person saying, I did not have these at the time, and they did not, in fact, exist at the time. Correct. So that's the only thing the judge had. Exactly, and that's our position that the testimony from Ms. Stevens and Ms. Bino was not controverted by CMS. The surveyors couldn't controvert it, and CMS didn't present a declaration from the therapists. So there was no basis for Judge Hughes to make that credibility determination, and as such, she relied on something that the only evidence we have is that it ‑‑ see, my time's up, ma'am. You may answer the question. The only evidence that we have is that it was created after the fact. It did not exist at the time, and if, in fact, that's the case and it wasn't communicated, then it is tantamount to a fabricated document, which Congress does not intend for agencies to rely on in order to meet either the abuse of discretion standard or the substantial evidence standard. The same is true with the physician testimony. Okay, you save time for rebuttal, counsel. Thank you. You may proceed. May it please the Court, Tanya Savage for the respondent, the U.S. Department of Health and Human Services. The respondent respectfully requests that this Court affirm the Secretary's decision, which determined, in pertinent part, that the facility did not act in substantial compliance with federal regulations as required for participation in the Medicaid, Medicare programs, and also the imposition of the $81,650 civil money penalty is reasonable. As Judge Duncan indicated, the parties are not here to relitigate the case before the ALJ, the Administrative Law Judge. Rather, as this Court held in the estate of Morris v. Shalala, the burden here or the inquiry is whether the Secretary applied proper legal standards and if the record as a whole is supported by substantial evidence. Can you win without the therapy notes? Yes, Your Honor, it is our position that we can prevail without the therapy notes. Where in the record would they know that he was a fall risk in the restroom apart from the therapy notes? Yes, Your Honor, and as you pointed out, the resident was transferred into the facility for a short term. He was there for a short-term basis to undergo specifically occupational therapy and physical therapy and to return home. The transfer records clearly state he had a history of falls. He needed assistance with walking, sitting, toileting due to risk of fall. His plan of treatment for outpatient rehabilitation, again, the sole reason he entered the facility to begin with, indicated he was a fall risk and unable to react safely to the challenges of the balance. This is all in the record beginning at page 10, 600, 3172, 3173. Also it noted a decline in his ability to use assistive devices such as a wheelchair, and he was a risk for fall when rising from a sitting to a standing position, also in the record at page 12. How is it that the court seems to have discounted the doctor's testimony, which was the most current information and it was a physician? The judge did not discount. She just did not give it the weight that petitioner wishes that she had. The doctor's notes was merely that a note. It was an unsworn statement, and it was an observation of the doctor. Well, all these things are unsworn statements, the transfer notes, all these things you've been talking about, right? The doctor's notes, and you're correct, Your Honor. So there's no less than those other things. Well, the doctor's note wasn't based on an actual evaluation of the resident. The doctor was scheduled to see the resident the very next day at the request of his wife, who had indicated that there was a decline and she had concerns about his issues, and also that the occupational therapist and physical therapist had indicated to the staff, and it's uncontested, they spoke with the director of nursing as well as the assistant director of nursing, that there is a decline, so much to the extent he fell on my lap today. He needs to be supervised. Right, and when the doctor saw? They were passing the nurse's station, and it was more of an exchange of pleasantries. The doctor did not evaluate him and the doctor in his notes. Okay, where is the record for that? Because this is completely different than we heard just a minute ago in great detail. So why do you believe that they just passed each other at the nurse's station and that this evaluation and new medicine were not assigned? The doctor's note is at 3972 of the record of appeal and 703, where it states he was not aware of the therapist's characterization of the condition of the resident. He was not aware of the concern of his short-term memory loss, because the record also reflects that he could not recall things after five minutes, and this was not conveyed to him by the facility staff. And our position is to the extent that he was not made aware or the therapist's notes were even entered into the clinical record in a quote-unquote untimely, I'm not going to say fabrication because we won't concede, just because they were done a day late that they were fabricated, the onus is still on the facility. The facility is responsible for securing services, which includes occupational and physical therapy. Okay, but how can you say that this is even true about the therapy notes? Because if there's no one there to stand up for the notes, that at the time that these treatments had occurred and that these were actual observations, and you've got someone who says they're created after the fact, probably for purposes of preparation for litigation issues or investigations, then how can we rely upon the point that you just made? It depends upon the fact that these services had occurred and these observations were made, and those people are not in this record. And, Your Honor, our position is that it's based on the record and uncontested by the Director of Nursing that this information was communicated to the staff. Where is that uncontested? Yes, Your Honor. She's saying it's contested. It's at the Record of Appeal at page 12 in 3265. And the Director of Nursing also conceded that the facility had no mechanism or procedure in place for the therapist to timely report or what the timeline would be for that reporting. And, again, if that were a requirement and the occupational and physical therapist failed to convey with those timelines, the onus is on the facility because they're responsible per regulation to secure these services. But that's not what they were cited for. They were cited for not doing a comprehensive assessment. They were cited for not putting interventions into place. And they were cited for not administering the facility in a way to avoid harm to its residents. And based on the facts in the record, the fact that he was a risk of fall, and the deference that was ñ I'm sorry, not the deference, but the review by the DAB in looking at this, it looked at the record as a whole, which clearly that short-term period that the resident was in the facility, there's a clear glaring indication that he is at risk. And there were communications, although not written, but conveyed to the staff, and that is uncontested and in the record. And so whether you have the notes untimely or not, that communication was made. It was conveyed to the staff in the record, the page 12 and then 3265? Yes, Your Honor. Is that what you're relying on? Assistant Director of Nursing at page 12 and 3265, and the Director of Nursing at 3976 through 3977. And they'll say that it was conveyed to the staff repeatedly in a glaring fashion that he was a risk of fall. They said it was communicated, yes, Your Honor. Okay. And then turning back, what the Department of Appeal Board did in its review with the record and the weight given to the attending physician, as you asked, as this circuit is held, the witness credibility and weight afforded or accorded to specific evidence. Here the doctor did not testify, but the petitioner did offer his statement. And again, to the extent that it was pivotal, it was a brief exchange, and the doctor does admit that he was not aware of anything that was going on. And our submission to you is that onus or that burden was responsibility, I'm sorry, for the facility to convey that in taking care of its charge of its patient. Wait a second. I thought they submitted the whole thing that said he had been seen and he had this illness that required this medication and he was examined and put on the new. I thought that was all in the record in the written papers. That was initially. But again, the resident was only there for a short term. And they conducted their initial assessment of him and the minimum data status report and all of this to assess him as a low-risk fall very early on. And by week two, in fact, by March. No, this is the doctor visit the night before that's supposedly in detail in the record. There wasn't a doctor visit the night before. The doctor's visit was scheduled the day after the fall. Okay. This is a big record battle. And this is going to be decided on the record. Because you understand they just said that he had seen him the night before the fall. And it is in the record. But he saw him in an exchange at the nurse's desk. He did not assess the resident the day before the fall. You are contesting that the record shows unequivocally that there was, in fact, an evaluation by the doctor the day before he fell. Correct. There was not an evaluation. You're saying that there's at a minimum a dispute, I guess, over that point. And we'll hear from the other side on that. The doctor had seen him prior to the week of the fall. But the doctor was not aware of what was the decline. Were they a decline based on nurse's notes and all of that? It wasn't conveyed to him. And his wife requested an appointment for him, which was going to occur the day after the fall. The doctor merely saw him in passing the day prior to the fall, and just through his verbal exchange said, oh, he looked fine to me, that sort of thing. But it wasn't an evaluation, and he wasn't, the doctor states, was not aware of everything that was going on and the concerns of his decline. All right. That's helpful. Well, you seem to be making some hay on the fact that the doctor didn't testify more. The doctor couldn't have testified under the procedures of the court, right? No, the doctor could have testified. He was not called by the petitioner. They could not call him according to opposing counsel. Is that true, or is this yet another thing that y'all disagree about? They could not call him. He could only be called on cross by y'all. I'm not, you know, underlying it. The way the judge's rules are set up, you are correct. She allows for cross-examination of witnesses. But the agency could have called him. The petitioner submitted his note. They could not call him, could they? You're correct, yes. Okay. So it's neither here nor there that he didn't otherwise testify because he couldn't have. You're correct, Your Honor. And our submission to you is that barring his testimony, the record is, or I'm sorry, whether or not he was allowed, the statement that he presented, again, describes an encounter the day before. So he had and he admits no clear indication of what the resident's condition was at that time. Specific to the petitioner's assertions of the new medication, again, to the extent that this was a miracle drug that was going to rehabilitate the resident, this also should have been chronicled in the clinical record to show how it was either helping or not. If you look at the transcript and the nurse says it wasn't a miracle drug, but it was noted as a side effect to give energy, but there wouldn't be some substantial change overnight because he was just prescribed the drug. Specific to the therapist's notes, again, the facility had no mechanism in place for the therapist to annotate this, but they did communicate it. And, again, that's in the record uncontested. And I like to say that the regs do not distinguish between services a facility provides and those it arranges. If the facility doesn't employ disqualified professionals to provide services to residents, it must furnish the services with an outside source, and they're responsible for the service those providers serve and ensuring the services are quality. And that's at 42 CFR 48375H. Counsel, if we cannot consider, just hypothetically, if we are not able to consider the therapy notes because the only record evidence shows that they didn't exist at the time of the fall, if we cannot consider those notes, and if your citations here do not show that the facility was well aware that he was a, what was the term you used, a big, glaring, glaring fall risk, then is there anything else that would allow us to find substantial evidence, or do you concede that you would lose? I think if you do not consider the therapy notes, I think just the fact that the facility is charged with the care and well-being. And the hospital, again, he was there for a short period of time. We're not looking at a year. We're looking at two weeks, barely two weeks that he was in the facility. And at the concern of his wife, at the concern and the notes of the facility, Avalon's notes specifically in the clinical record state he was at a history of falls. He had problems with decreased movement in his lower extremities. Several of the provider notes indicated he was unable to recall information after five minutes. Are these the transfer records that you're referring to here? No, this is actually the clinical record with Avalon, sir. A March 19th note stated that he required assistance for his toilet use and, quote-unquote, set-up help requiring one-person assist for personal hygiene, and he was unsteady when moving from a seated to a standing position. And that's at the record at 3245 and as well as 12. Can I ask you, counsel, Ms. Brewer referred to his assessment at a seven. I think I'm remembering that correctly. Is that in the record? And tell me what you think that means. That is at the record, and that was at the onset when he first entered the facility. And Ms. Brewer didn't have a chance to discuss it, but I think her contention is the facility was not or did not have an obligation to assess him again until after he died is when they would have been due. But our position is based on not only his transfer records but what the nurse's notes reflect, the facility's nurse's notes reflect, independent of the therapist and the fact that the doctor said all information regarding this patient was not communicated to him. The onus is still on the facility to provide a safe environment consistent with its policy. Do you agree that an assessment of a seven is not a serious fall risk? I would agree that an assessment of a seven is not a serious fall risk at that time. That's when he entered, you're saying? And who did that assessment? Correct. The facility did it based on hospital transfer records. But at that time you are correct, Your Honor, that it was not a significant risk for falls, but if you look at the day-to-day notes as indicated in the record, clearly he was on the decline to the extent that his wife asked for an appointment and had some concern about what was going on with his stability, physical stability. With that, I think in looking to the regulations themselves, each one and the facts cited in the record is clear that the facility did not adhere to its obligation or comply with the regulations as required for participation in the program to the extent that the petitioner argues it was the fault of the administrator or they were precluded from doing certain things. It is our position that there are a number of opportunities afforded to the petitioner to state any objections related to its in writing to preserve here, as were before you, in regard to any bias or prejudice and just any systemic issues that it may allege in its brief regarding what the review process is. Again, this court today is charged with whether the Department of Appeals Board applied the proper legal standard. It's certainly our position that it did. It looked at the record with substantial evidence and just assessing, again, the short term that the resident was in the facility and the progression of his decline, unfortunately, and the fact that a nurse who wasn't quite familiar with him, and there is a testimony in the record that there are other nurses who assisted him  He never asked for privacy. He always requested the assistance. Coupled with the wife's concern in requesting the doctor's visit and the doctor's position that he didn't have this information before him and wasn't aware, and the fact that he saw him in passing and didn't have a chance to evaluate him before the failing fall, we think that the record is substantial. That being said, the decision of the Department of Appeals Board was not arbitrary and capricious. The record as a whole is based on substantial evidence. And while this decision is not ideal to the petitioner, it's not so implausible that this court should not affirm it. And I see I have a little bit more time and I'm acquiring any questions. Okay, thank you. I think we have your argument. Thank you. Thank you. Thank you, Your Honor. This is Petitioner's Exhibit 14. It's on pages 702 and 703 of the record. I think the text probably appears on 703. 702 is likely the cover page. To whom it may concern, On March 27, 2013, at approximately 6.30 p.m., I, Dr. David Mandel, spoke with Resident 73 at the nurse's station at Avalon Place, Trinity. Resident 73 had ambulated using his walker to the nurse's station from his room number 461. Resident 73 confirmed his appointment at 9 a.m. on March 28, 2013, at my clinic. I acknowledged to Resident 73 I would see him in the morning at his appointment. Resident 73 ambulated back to his room using his walker. Resident 73 did not appear to be in any distress. I reviewed his chart and his lab work with the Director of Nursing, Angel Bino, RN. The Director of Nursing and I discussed Resident 73, and there were no concerns. He was alert and oriented and able to make his needs known. Resident 73 was able to be left unattended in the bathroom. He was independent with his activities of daily living. Dr. David Mandel. Okay, now, so I understand that's the evidence of the doctor's observations of him the day before? 6.30 p.m. the night before. 6.30 p.m. the night before. Yes, Your Honor. Now, Ms. Savage said that the doctor had evaluated him a week prior to that. March the 20th, and his progress note from March the 20th is in the record. Okay, and then she further said that in that week period, the claim is that there was a decline and that his wife asked for a reevaluation, and that was scheduled. The doctor's appointment, yes, the doctor's appointment. Yes, and that hadn't yet happened yet. It was scheduled for the following morning, and actually on March the 20th, in the doctor's note you will see from Dr. Mandel, he recommended an additional follow-up with a hematologist oncologist for the myelodysplastic syndrome. It's a condition that attacks the red blood cells in the body and can make you weak. He had recommended a follow-up of that. He had said until that can happen, I'm going to schedule the appointment for the 28th. I'll see you in a week. In the meantime, we will start this drug Procrit. And the nurse's notes on March the 27th, the day before this incident, indicate he's given 40,000 units of Procrit. He has a very positive result to that. It's later that evening that he's with his walker up to the nurse's station, and that is the result in the note that I just read to you, where he sees him and he says how he ambulates, how his mental state appears, what he is and what he is not able to do. I do want to point out one thing. Ms. Savage cited you to page 12 of the record as evidence for something that the director of nursing admitted. Page 12 of the record is not an admission by the director of nursing. That is part of Judge Hughes' opinion and how Judge Hughes construed the evidence. It's our position in this case that Judge Hughes was wrong in the way she analyzed the evidence. And what we have here also, Ron. Well, I believe that exchange, I may be getting this wrong, is we were talking about the therapy notes, which are dated after, right? That's correct. And the contention is, well, the information in those therapy notes was communicated. They were just memorialized the day after. And it's our position that that's not true. If you look at the nurses' notes, the only communication from the therapy staff is on the afternoon of the 27th, when the therapy director, Susan Barnes, calls a nurse named Andrea Bell and says he was a little bit tired in his therapy session today. And Ms. Bell says, it's not surprising. He's got a doctor's appointment in the morning. We've got this medication we're about to give him this afternoon. We're on top of this. We're going to get this taken care of. Then the nurses' notes indicate they give the Procrit. He has positive results. By 6.30 in the evening, he's up. He's ambulating. He's going to visit the doctor. And incidentally, the record, the testimony from Jackie Stevens and Angel Binos shows they were both at the nurse's desk when Dr. Mandel saw resident number 73. So we don't just have Dr. Mandel's statement. We have Ms. Stevens' testimony regarding what she observed. We have Ms. Binos' testimony regarding what she observed. And that is not controversial anywhere. With respect to Judge Hughes' rules, procedures, with respect to, you know, as I understand it, you can't call a witness except on Procrit. That's correct. Was that something that was contested before Judge Hughes? That is something that the board allows each one of the individual administrative law judges to set their own pre-hearing order for how these cases proceed. There is one judge who still does not do it that way. He still does the traditional you call the witness, you do direct cross-re-cross, and he limits it to one re-cross. Unfortunately, Judge Duncan, after the lapse in appropriations in 2013, the budget for HHS was significantly affected and funding for administrative law judge travel was stopped. When that stopped, that's when we saw the switch to more of the judges going to pre-filing because we don't have these hearings in person anymore. They're done by video conference and believe the pre-filing requirement is an effort that's made by the judges to streamline the proceedings. And there can be debate about whether it's good or bad, but it is something the agency gives the individual judge discretion to decide, and those orders are not subject to objection by the parties. Why didn't Avalon call the therapist on cross? There wasn't a separate statement from the therapist. But you don't have to have a statement, do you? Yes, you do. You can't call anybody if there's documents that they've authored? You can't call them on cross? You cannot, not under the pre-filing requirements. The only people that can be called on cross are people for whom a written direct statement. How do you challenge documents then? It's very, very difficult, and as a practical matter, when we challenge them, we're told the federal rules of evidence don't apply. They're a guideline, but we don't have to adhere to them. We, being the ALJs, are going to let everything in. You've answered my question. I think we have your argument. Thank you very much.  Thank you. Thank you.